Our next case up is 4-12-0-5-0-4, Tiller v. D.C.O.F.S. et al. For the appellant is Mr. Novick. For the appellee is Mary Labreck. Is that pronounced correctly? Yes, Your Honor. Okay. Before beginning, Counsel, I want to mention that we ask everyone to be here half hour early. Sometimes we can start early. Okay, you are here and we can. I thank you for that. With that, Mr. Novick, you may proceed. May it please the Court and Counsel, I appreciate the opportunity today to ask you to consider reversing a decision of the Department of Children and Family Services that indicated a young lady by the name of Jessica Tiller for 50 years. That means she'll be in that state's central register for much of her adult life. It's a very sad, factual situation. Fifteen-year-old Casey lives with his mother in Gridley, Illinois. Casey is on juvenile probation for burglary. His mother is apparently having sex with his friends, and Casey is having sex with a number of young ladies in the neighborhood. And at age 15, he meets Jessica. Jessica is 19, and they conceive McKenna. When McKenna is three months old, there's a DCFS investigation, and the issue is whether McKenna has been abused or neglected. When the department is going through that investigation, they eventually determine that there's a four-year age difference between Casey and Jessica, and Jessica is older, and therefore she is indicated for penetration just as an adjunct to this investigation. The department needs to show, by preponderance of the evidence with regard to the penetration issue, that not only that it happened, and I would submit that McKenna is living proof of that, but that Jessica was an eligible perpetrator. And we're going to ask you to consider today whether they did that. The administrative law judge to do that had to make some findings that, as an eligible perpetrator, you had to fit in one of six little boxes, and the only real box that was contested was whether Casey resided in the home at the time of the penetration. The administrative law judge used three bits of information to make his decision. One of them was that Casey was in the home, but he cites to the juvenile court record, and the juvenile court record says that Casey was living in the home at the time the child suffered the abuse. The child is three months old at nine months of gestation. He misses the boat there and says, aha, he was living in the home, but the penetration or conception, depending on the word you want to use, occurred 12 months before that. With regard to the issue of eligible perpetrator, it was clear from the record that Jessica was not Casey's parent, was not his caregiver or immediate family member or person responsible for his welfare, or the paramour of his parent, and that left residing in the same home. There were two other bits of information that the administrative law judge used to determine that, quote-unquote, Casey was living at the home at the time, well, he got the time frame wrong, but the other two bits of information he used were the testimony at the administrative hearing and the investigation. The investigation was as sad as the facts of the case. When you read the opening paragraph of the investigation, it says, this mom put on her Facebook page that she wanted to die and never wanted to have this child. That's a fairly strong statement. The investigator does not testify at the administrative hearing, probably because of embarrassment, that's my guess, but they put the supervisor on and we asked the supervisor, where is it in the Facebook pages that you've attached to your investigation that the mother said, I want to die and I wish I didn't have this child. She starts to look, she looks for 10 minutes, the administrative law judge uses the restroom, comes back and she says, it's not here. That's the kind of investigation we're dealing with. The reporter of the investigation is a lady by the name of Crystal Dozart. The state's lay witness, who is her ex-best friend, says she's a hypochondriac who's tried to commit suicide several times and couldn't get it and is a drama queen. The other lay witness for the appellant in that case testified, she's my ex-sister-in-law and she's a hypochondriac and she's tried to commit suicide and she's a drama queen. So now we have double hearsay of a lunatic that is being used to substantiate allegations against Jessica Tiller. That's the investigation we're using, but more specifically to the point, with regard to the issue of what did it say in the investigation with regard to Casey residing in the home, there's nothing in there because the investigator never talked to Casey. The evidence in terms of the live testimony, in terms of was Casey living at the home at the relevant time frame, is from the state, and that is from Gina Dutrow, who is the sister of Jessica Tiller. And Gina says, well, he stayed there a lot, he was there a lot, but she moves out of the residence in May of 2009, and by my simple calculation, conception occurs roughly in August of 2009, and when asked directly, were you ever in the house in the evening after May of 2009, she said, I was never there. She also used the word homeless with Casey. He was there occasionally, but he had been abandoned by his mother, so he was also staying with one brother in Lexington, and another brother in Lincoln, and three different friends in Gridley, Illinois. So Casey was homeless. Was Casey there occasionally? Sure he was. He never got mail at the residence. He was never enrolled in school in that district. He occasionally, quote unquote, needed a place to crash, and they were kind enough to let him crash there occasionally. To make Jessica Tiller an eligible perpetrator, you have to find that he was residing in the home. This is where the juvenile law sort of diverges from the criminal law. If you commit a criminal act, it doesn't matter if you're an eligible perpetrator or not, you've committed the criminal act. But in juvenile law, if somebody randomly commits an act, that doesn't necessarily mean DCFS is going to indicate them, because there's no relationship there. There's no nexus that would cause them to be indicated. We're asking you to find that the department has misinterpreted its rules so badly, a la the Perez versus DCFS case, that your review should be de novo. In the Perez case, as I recall, we had a situation where a lady was indicated, and she was also charged with a crime. In the DCFS world, if you're indicated for something, but there is a criminal case or a juvenile case, DCFS says there's an automatic stay that we place upon that, and once your case is resolved, come talk to us. If the case is resolved in your favor, we'll give you an administrative hearing. But if you're convicted of something or adjudicated of something that's the exact same thing that we're in juvenile court for, the race has been decided, and we're not going to listen to it again. Well, in any event, her criminal case was now prossed. She didn't get back within the 45 days, and DCFS said, we're not going to let you appeal, because we have a final administrative decision, and you didn't get back to us within 45 days. Well, it was now prossed, and the appellate court said, wait a minute, you are misinterpreting this rule very badly, and we'll review that de novo, and the case was changed. And that's what we're suggesting is happening today. We have a rule that says you have to reside in the home. If you look at the state's brief, they're saying at one point, well, that house was his home base. How do you define home base? Well, it's not defined in the statutes. It's not defined in the regulations. From the facts of this case, you'd have to define it was, he crashed there occasionally, got no mail there, had a bag of clothes there, and that's good enough for home base, and therefore we can indicate you. That's a pretty large stretching, I would ask you to decide, of the administrative rule. At one point in their brief, they said, well, it's his annex. His house was his annex, so we have a homeless kid with an annex. That's pretty good work if you can get it. And we're suggesting, once again, they're stretching the rule. The witnesses who testified with regard to Jessica's side of the case, there were three. One was a lady by the name of Christy Stein who testified. Casey was homeless. Sure, he stayed there on occasion, but he stayed with his brother here, his brother there. He visited his mother occasionally in Lincoln, and had three different friends that he stayed with. Teresa Whitmer, who was Jessica Tiller's mother, was described as having a heart, and so when this kid needed a place to crash, occasionally she would let him stay there. Jessica talked about the same thing, and also she could actually name the young men that Casey stayed with in Gridley, Illinois, when she wasn't staying at Jessica's house. Based on all the evidence, we believe that the proper standard of review would be de novo, because the state is stretching this regulation fairly far. But I believe that even if you decide that this is merely a question of mixed fact, or a question of only fact,  Can you be homeless and not be homeless? Can you be homeless and reside in a place at the same time? I don't think so. We've made some arguments with regard to the Julie Q case. Although Jessica acknowledged in the adjudicatory hearing in juvenile court that she had neglected this child, the basis for that neglect seems to be the exact same thing that the appellate court rejected in Julie Q, and that's on appeal right now to the Supreme Court. My colleague told me that that had been argued but not decided, and so that's an issue I suppose that will be. We made some constitutional arguments. We tried to suggest that even if you find that she's an eligible perpetrator, what is the juvenile court trying to protect? And we made some suggestions that we're protecting a kid who has more experience than many adults his age, and is that really what the juvenile court, rather the Abused and Neglected Child Reporting Act is trying to protect? I appreciate your time. Thank you, counsel. Good morning, your honors. May it please the court. My name is Mary Labreck. I'm an assistant attorney general here representing the Illinois Department of Children and Family Services. I'd like to start by pointing out that this is not a case of two kids fooling around. Still less is it a situation in which the plaintiff was taken advantage of. The provision under which she was indicated screens for persons who use their privileged access to a child through family relationships, positions of trust, or a connection to the home. That access allows them to gain trust before abuse and to make good on their threats afterwards. And the indicated finding prevents those persons, as far as the state can manage it, from being placed in a position where they will have access to do that again. In this case, the plaintiff was... This is typically the stepfather or uncle Charlie or mom's boyfriend who's abusing some child in the home, though, isn't it, that we're talking about? Well, often it is, and the statute specifically refers to parent and immediate family member and paramour, but it also refers to situations when you have an individual, not specified in another way, an individual who resides in the home. Well, that seems to have been the point Mr. Novak argued extensively. Would you agree that if this 15-year-old wasn't residing in the home of the respondent, then there would be no basis for the charge PCFS brought? That's right. If he were not residing in the home, then... It doesn't particularly speak well of her, but if she's hanging around and having sex with 15-year-olds, that's not what this is about. It's a matter of, is he residing? That would be a criminal act, and it would be... But that's not what this is about. This is about dealing with someone who's residing in the home. Well, I suppose then, what's the evidence that shows he resided in this home? Well, the act directs the department to make a common sense determination whether the perpetrator and teller were residing in the same home, and that determination is entitled to deference. And there are a number of bases on which the director relied on to make that decision. To begin with, the investigation... A number of people, the initial reporter, also the child CC and the plaintiff opposing counsel is mistaken that they never talked to the child. It says several places in the investigation. I believe on more than one occasion they spoke with the child, and there has been no testimony presented in this case to suggest otherwise, to suggest that that is an error. The plaintiff's sister, Gina Dutro, testified that they were living together. She reasonably inferred this because she saw him, he was always there. It's true that she didn't spend the night that period, but she could make a reasonable inference that because he was always there, he was living there, and she has never disputed that he did in fact stay the night there. Her dispute is only the number of nights that he spent. Her own witness, Christy Stein, said that she told her that he was living there for a period of about a year, which extends from the time of conception to the period at which the child was diagnosed as injured, and there was the juvenile adjudication. The plaintiff's sister, Dutro, also said that the relation was going on and they were living there together throughout the entire pregnancy. The child's probation officer accepted that they were living there, and generally you have to have a residence, and if you lie about it, you risk further consequences. As we've already suggested, the court in the wardship proceedings found that they were living there, and all of the evidence suggests a single undifferentiated period in which they were living together, and the sister clearly distinguished that there was a time at which the child occasionally stayed there when he was younger, but then there was a time beginning around September 2009 which they changed their status and they started living together, and their status remained the same through the period of the diagnosis of the fractured ribs. The child's CC's mother called for him there, expected that they would know where he was, that's another characteristic of a family or home. The child's brother came to live with him when he was temporarily out of a place to live, that again is characteristics of a residence or a home rather than a place that you simply visit. What about the evidence that shows he was essentially homeless and he would be bouncing around occasionally alight at this place? Well, the same witnesses who said that he was living there said that he was homeless, and I think what they meant by that was that he didn't have a legal right to stay there, but the statute and act says nowhere that the child has to have a legal right to stay there in order to count it his residence. So in these regulations residing means staying there a lot. That's how we should interpret it. It's left for the department to determine when staying there is enough under those circumstances. Wow. That's an enormous amount of discretion to place somebody for an indicated finding. Well, it has to be. It's not just whatever they want. It has to be enough that you count a person as living there. And we see it in a number of different ways for a number of different purposes. He was counted as living there. I don't know what that means. Somebody said he lives there. What does that mean? What does that mean? Did he do his laundry there? Did he take meals there? Did he have shaving cream there? Did he have clothes stored there? Did he have access to a vehicle? Did he drive a vehicle in that party's home? He wasn't eligible to drive a vehicle because he was only 15 years old. He didn't have many possessions. He didn't have many possessions. That sounds like he's homeless. Well, not well provided for. There are some children who have very little who are residing with their parents or other caretakers. This child was not well provided for. But he did have a significant amount of shelter. And while he did, he spent a lot of nights out. But the statute also says nothing about how many nights out will remove him from the residence. But he clearly intended to stay there. And he was a permanent resident insofar as a teenager can be a permanent resident. We don't expect that teenagers will permanently stay. So residing is a different standard for a teenager under this Act than residing is for the purpose of voting or running for office or having maintenance terminated because you're involved in a relationship even though you're getting maintenance from an ex-husband or whether or not the drugs that are found in the bedroom could possibly be yours because you sometimes have stayed in that house. These kinds of issues come up all the time. They do. And the statute doesn't refer to any of these definitions. Wouldn't it be correct if someone said, where does this kid live? Oh, he stays here occasionally. I would pretty much describe it. Of course, he's this 15-year-old boy and Jessica Tiller is this woman who is happy to provide sexual favors for him. So he's going to show up there. And that's pretty much it, isn't it? Well, there was nowhere else that he returned to as home. Well, that's the description of being homeless. He's got no place to live particularly. He stays here occasionally. He's out and about doing other stuff. But he stayed there an awful lot. By her own testimony, it was at least two to four nights a week over a period of a year. And the sister said he was always there. Two to four nights a week is a tomcat. I mean, he's bouncing all over the place. Yes, he stays there two to four nights a week for a period of time. But he's basically a tomcat. He's all over the place. I don't think we want to say that he doesn't reside there if he's out of the house too many times a week. Because suppose he was living with his mother and he went to sleep wherever he could at the time. And then we would say that it was okay to that a person couldn't be indicated because he wasn't living in the home of his legal guardian. I think that's exactly right. As a matter of fact, that's an excellent way to put it. Let's assume he was living at home with his mother and she didn't care what he did or where he went. But that's where his clothes and things were. And there's this woman who's happy to provide him with sexual favors and, sure, come on over whenever you feel like it and we'll bed down together. And he does that two or three times a week. Is he now living with Miss Stiller or is he still at home with Mama? Where's his residence? If he was treating home as Mama with his residence if it was clear that he had an intention of returning there and maintaining his residence there for lack of a better word. That's the problem right there, the word intention. I don't think he had any intentions. He was flotsam. And just moved wherever. The testimony was that he wanted a family, he wanted a relationship and this relationship gave him a right to security, to food, to heat. Who provided that testimony? The plaintiff's sister provided the testimony that that's what he wanted. And plaintiff, when she got to testify, never suggested otherwise. Neither did the mother. And he was free to come and go as he pleased just like a resident. No notice, no permission, no nothing. This case is factually an outlier which goes back to the very first question I asked about the purpose of this provision dealing with residences obviously to deal with the paramour or the older adult taking advantage of a situation having some sort of sexual relationship with others in the home who are younger. This is not if one said give me factual circumstances that we want to address by regulation to correct or to condemn people for how they're living, this is not the first that would come to mind. Indeed, I'm not sure it would be the 18th. No, Your Honor, but the statute does say parent and paramour. It says these things specifically members of the family, persons entrusted. And then it says something else. And then it says in addition to those people an individual residing in the home. We have an example right here in the plaintiff's home. There was an adult male unconnected to the family living there with her brother. He was an individual living in the home. And if he had molested this child or molested any other child, he could be indicated. That goes to my earlier question. Had he been asked or the other parent asked, where does Charlie live? Whatever his name is, I forget. Oh, he lives here. That's what they did say. That's not CC. It would be more he stays here sometimes. But the sister said he lives here. And they told the investigator that. They told his pro person that. They told the court that adjudicated the wardship. For all these purposes, they said he lives here. He spent lots of time there. He had no intention of moving. He considered himself to be her boyfriend. He was creating a family there. He wanted a connection there. What did CC say? He said he was living there. When the investigator spoke to him, he said he was living there. At that time, I don't believe they realized the consequences of that, but that's what he said when they talked to him. And that's what plaintiffs said when they talked to her. They asked the parents, do you have a problem with them living together and sleeping together? The parents said no. They didn't say he doesn't live here. This thing occasionally only came up at the administrative hearing when they realized that there could be a consequence attached to the fact that they lived here. It becomes clear when you look at some of the way the plaintiff is compelled to recast these things and say he wanted a family, so he stayed there occasionally. His mother had a soft heart because he was homeless, so she allowed him to stay here occasionally. That's not what was happening. What was happening is he didn't have a home, so they provided him one to the extent that he wanted it. Lots of times it got too hot for him because he argued with his sister. The brothers didn't like him and wanted to get out. So yes, there were lots of reasons he left, but he wanted that to be his home, and he spent a significant amount of time there. To define this in any other way would have the consequence of leaving a number of children without protection and those children who are the most severely abused and neglected. The children that are abandoned by their parents are the people that are going to be living in these cobbled together situations. A period of time here, a period of time there. The perpetrators are going to be able to use their connection to the children with the home in order to be able to indicate these children. DCFS reasonably wants to be able to do something about that, and that is why the statute specifies that any individual residing with the child. We will also note that in the Sex Offender Registration Act there is an extremely narrow and restrictive definition. A person has a residence or temporary domicile if they are there for three days. So this is not a case in which DCFS is tremendously reaching to call this a residence. Because the statute is a civil intermedial provision, it must be liberally construed in the context of the statutory purpose, and to say that you have to have a legal right and they didn't spend enough nights there. But the statute doesn't say anything so restricted. And there are plenty of children in shared custody situations or children moved around because of disasters like hurricanes or death in the family, and so on. So if he lived with his mother and came over every night and then crawled out the bedroom window at midnight and went home, he wouldn't be an abused child under this act. This provision of the act, because he's not living there, he's not residing there, nobody there is responsible for him, he's just taking advantage of the situation. So he wouldn't be protected by this. That's right. If he had a home to go to, there are criminal laws that would protect him. But DCFS would not take an indicated report of abuse. They wouldn't be supposed to. If he clearly had a home, that's right, they would not. Is he being abused? Yes. But DCFS wouldn't want to get involved because he was not living there. Well, DCFS has a statutory mandate to address the situation, not all possible situations in which children are abused, but when there are these family relationships, positions of trust and connection with the home that facilitate the abuse. For the rest of them, we leave the criminal law to take care of that. But if his mother let him go out every night and knew what he was doing and came back and he lived in her household, then she would be responsible for him and he'd be abused or neglected. Is that right? In that instance? Well, she could potentially be indicated, I suppose, for allowing him to engage in sexual penetration or... Well, it's the acquiescence of the aforementioned group of people. He resides in her home, she lets him go do that. So she could be indicated for sexual abuse. In that instance, Your Honor. What are the consequences of the indication finding as far as Tiller is concerned? They're not quite as severe as she suggests. The consequence will be that she will be prevented from any job that involves her working with children unless she obtains a waiver. She suggests that her presence on the Healthcare Workers Registry will be a problem, but the provision that she cites in her brief actually refers to adjudications before the Department of Public Health and not DCFS's. The Healthcare Registry is public, unlike DCFS's registry, and there is no suggestion that indicated will make its way to the Healthcare Workers Registry. Your Honors can take judicial notice of the Healthcare Workers Registry that her indications are not in fact listed on her registry. And she has another problem in that in order to be a CNA, she has to pass a competency test. And her Healthcare Registry shows that she has failed the competency test three times. So your suggestion is that this indicated finding will not cause any problems as far as getting a job? It may somewhat limit her getting a job, but we're suggesting that that is justified and that is the purpose of the Act to keep her from being in a position where she has this kind of access that may lead to this kind of behavior again. So she couldn't, for instance, be a childcare worker? Right. And she probably should not be the head of a home for teenage boys. How about taking care of four-year-old kids at some preschool? Well, if she wants to work for some three-year-old kids and there is nothing else in her record, then she could seek to obtain a waiver. And your suggestion is barred? I'm sorry. Absent a waiver? That's right. Absent a waiver, she can't take the job. But her employer can look into the waiver and she suggests that it's obvious that she shouldn't have been indicated. And if that's true, then she shouldn't have any difficulty. She can't have it both ways. On the one hand, she says that this is ridiculous. And on the other hand, she says that if people know about it, she's never going to work again. Thank you, counsel. Time is up. Mr. Novick? Your Honor, several times counsel cites to Jessica's sister and Jessica's sister testified, CJ occasionally needed a place to crash. He didn't have a home. He was happy for food and heat. He was happy for what? Food and heat. We cited in our brief also two definitions, residing and stayed. And I can't tell you how many times in juvenile court nobody lives anywhere. They stay places. But residing, verb intransitive, to live permanently, to have one's home. Stayed, to remain or sojourn as a guest or lodger, as in a motel. Your position is I think he did stay there occasionally. I would acknowledge that. The state says Casey wanted a family and wanted a relationship. I'm not sure where that comes from because he never showed up for juvenile court. They had to publish on him in order to proceed. Counsel argues that Was he interviewed? If it was, it was. I don't believe so. I didn't see it. The counsel argues that kids need protection. And she mentioned all those situations, the shared custody, the family relative emergency situation. Those are all covered by the regulation. You can be an eligible perpetrator if you're a parent or a caregiver or an immediate family member. With regard to the Sex Offender Registration Act three-day rule, you're convicted beyond a reasonable doubt of doing something and then you have to register. Here we have double hearsay from a lunatic at least in part who was the reporter. And yet Jessica may be stuck for 50 years in the state central register. And with regard to the Nursing Home Care Act cited, if the department finds that a nursing assistant has abused or neglected a resident or an individual under his or her care that's what Jessica is being accused of doing. She is being accused of abusing someone and I worry that in this economy jobs are tough. Thank you.